## UNFAIR COMPETITION BY THE EXECUTIVES OF A BRANCH CONCERN.

Superior Court of Cincinnati.

### THE FRENCH BROS.-BAUER COMPANY v. THE TOWNSEND BROS. MILK COMPANY ET AL.*

Decided, October, 1925.

*Protection of. Name and Good Will Against Unfair Competition—Executives of a Branch Business Independently Operated Establish a Compeing Concern—Use by Operators of their Own Names in Opposition to Parent Concern of Same Name—Injunction.*

1. The independent operation of a branch business, under a lawfully acquired and different name from that of the owner of said branch without disclosing such ownership, is not inequitable and does not preclude the owner from protecting the name and good-will of said branch business from unfair competition.

2. The general rule is that every person has an inherent right to the use of his own name in the conduct of his own business either individually, in partnership, or in corporate form, provided he uses it honestly and fairly and differentiates it from others having similar names.

3. The action of executive officers of a milk delivery corporation in forming a new and competing company while still holding their offices of trust in the old company and in hiring the drivers and route-foremen of the old company to work for such new company and to solicit their former customers to become customers of the new company, is a breach of the confidence reposed in such executive officers and of their obligation of loyalty, and will be enjoined as unfair competition.

4. The plaintiff, the French Bros.-Bauer Company, acquired and operated independently the Townsend-West Dairies without disclosing its ownership of said dairies. The defendants, the Townsend brothers were employed as executive heads of the Townsend-West Dairy and one of the Townsends was also a director of the plaintiff company. Said defendants formed the Townsend Brothers Milk Company to compete with plaintiff while defendants were still in plaintiff's employ and hired a number of plaintiff's drivers and route-foremen to solicit their former customers to become customers of the new company. *Held:*

1. Plaintiff is entitled to equitable relief.

* Affirmed by Court of Appeals, November 9, 1925.

2. The Townsends may use their names in the new company with the explanation that they are not connected with the Townsend-West Dairy.

3. The formation of a competing concern by said defendants while still in the employ of the plaintiff and their attempt to transfer its employees and customers bodily to the new company, is unfair competition and said defendants are enjoined from employing Townsend-West drivers and route-foremen over their former routes for a period of one year.

*Mallon & Vordenberg,* for plaintiff.

*John C. Hermann, Benton S. Oppenheimer* and *Harmon, Colston, Goldsmith & Hoadly,* for defendants.

MARX, J.

The old maxim that competition is the life of trade is good sense and good law. The policy of the law is to foster competition and to frown upon monopoly in the hope that better service and lower prices will result. Gorman, J., in *Home Steam Laundry* v. *Smith,* 8 N. P. (N.S.), 402. By this is meant fair and honest competition, for it is equally true that unfair and dishonest competition is the thief of legitimate business. The law, therefore, aims to encourage fair competition and to prevent unfair competition.

The law upon this subject deals with one of the most important phases of every day life,—the struggle for a living. It is free from legal red tape and technicality. It has been boiled down by the author of the best treatise upon the subject to one simple rule,—"compete honestly." Introduction to second edition of Nims on Unfair Competition, which concludes:

"The great fundamental rules of honesty and fair dealing are still the touch stones by which the relations of commercial life are to be measured."

The plaintiff complains that the defendants have transgressed these rules, first, in adopting the trade name of the plaintiff in order to take advantage of their good will; and second, in enticing away their employees for the purpose of securing confidential information and property of the plaintiff in its trade routes, etc.

The defendants deny these claims and assert the right to use their own names in a corporate capacity, and their right to employ all persons who will accept the employment offered.

Since, "each case is, in a measure, a law unto itself," and "unfair competition is always a question of fact," (38 Cyc. 779) the facts of the present case will be briefly stated.

In 1906, the French Brothers Dairy Company purchased the stock of the Townsend Milk Company which had previously been owned by John Townsend. In 1910 The French Bros.-Bauer Company was incorporated. The Townsend Milk Company corporation was dissolved and the business of the John Townsend Dairy and the Townsend Milk Company was conducted under the Townsend name as an independently operated branch of The French Bros.-Bauer Company. In 1915 the plaintiff purchased the business of the Charles I. West & Son Dairy and thereafter conducted the business of selling milk, buttermilk, butter and dairy products under the name of *"Townsend-West Dairy."* From the time the business of the John Townsend Dairy was purchased by the plaintiff, the sons of John Townsend were employed by the plaintiff company. There were three sons, namely: Henry, Elmer D. and Roy D. Townsend. From about 1912 Elmer D. Townsend was continuously employed by the plaintiff as the manager and executive head of the Townsend or Townsend-West Dairy. In 1924 he was made a director of the plaintiff company and was paid a salary of $10,000.00 per annum. During the same period Roy D. Townsend was employed by the plaintiff company as the head of the office force of the Townsend or Townsend-West Dairy. From the evidence it appears that the Townsend-West Dairy was operated as an independent dairy under the complete control and direction of Elmer D. Townsend who directed the policies of the dairy, including its buying, selling, advertising and the hiring and firing of employees. He enjoyed the confidence of the plaintiff to such an extent that he was asked to prepare himself to succeed Frank French as president of the plaintiff company. He had access to the confidential information of the plaintiff company and was permitted to spend

large sums of money by the plaintiff in advertising the products sold by the Townsend-West Dairy. In the expenditure of this money he advertised the name *"Townsend's"* as identifying a brand of buttermilk without using the word "West" in connection therewith (Exhibit No. 3). He also used the word *"Townsend's"* as identifying a brand of fancy butter (Exhibit No. 1). Milk, cream, eggs and cottage cheese were similarly advertised under the slogan, "Buy Quality, Townsend's" (Exhibit No. 2.)

In this manner and by reason of the long acquaintance of the public with the name "Townsends" in connection with a high quality of dairy products, a valuable good will was built up with the money of the plaintiff for the name "Townsend." In 1924 Henry Townsend became associated with and president of the Niser Ice Cream Company, a competitor of the plaintiff. In June, 1925, Roy D. Townsend and Elmer D. Townsend left the employment of the plaintiff company and immediately upon leaving the plaintiff company associated themselves with their brother Henry in a competing company and adopted the corporate name of "The Townsend Bros. Milk Company." Elmer D. Townsend became manager of the new company on July 1, 1925, and took with him a number of the key men of the Townsend-West Dairy, including the chief route foreman, some of the best route foremen, skippers and drivers of Townsend-West Dairy. Within a few days twelve more of the most valuable of the employees of the Townsend-West Company,—named in the amendment to the petition,—quit that company with the expectation of working for the new company.

There is uncontradicted evidence in the record that Elmer D. Townsend personally, within a few days after leaving the employ of the plaintiff company, solicited drivers who were working for the plaintiff company to leave their employer and to work for him.

The evidence further tends to prove that the Townsend Bros. Milk Company was formed and the plans laid for building up its business at the expense of the plaintiff company, while

both Roy Townsend and Elmer Townsend were still trusted employees of the plaintiff company and before they had given the plaintiff any notice of their intention to resign. *    *    *

Upon commencing business The Townsend-Bros. Milk Company sent the drivers formerly employed by the plaintiff company, over the routes which they had formerly served for the plaintiff, and although it does not appear that there was an exclusive solicitation of the plaintiff's customers, it does appear that a great number of these customers were taken from the plaintiff by the defendants. It is a matter of dispute as to whether these customers, or some of them, were misled by a similarity of milk bottle caps, names, color and dress of wagons and what was said to them by the drivers into believing that they were still dealing with the same company from which they had formerly bought milk. Shortly after this alleged raid upon the business of the plaintiff was commenced by the defendants, this action was brought to prevent the use of the word "Townsend" by the defendants in the milk business and to prevent the defendants from enticing the employees of the plaintiff to leave their employ or to solicit the customers of the plaintiff by the use of confidential information or trade lists acquired by the defendants or its employees while in the employ of the plaintiff company. *    *    *

Subsequently the defendants filed answers to the amended petition, and by agreement this cause was heard by the court upon its merits. Upon the hearing three questions were presented and have been ably argued by counsel upon both sides.

*First.* The defense that the plaintiff is not in court with clean hands by reason of its operation of the Townsend-West Dairy without disclosing the plaintiff's connection therewith.

*Second.* The prayer for an injunction to stop the defendants from using the name "Townsend."

*Third.* The prayer for an injunction to stop the defendants from hiring the employees of the plaintiff, or soliciting the customers of the plaintiff.

These questions will be considered in their order.

First.—*Does the operation of The Townsend-West Dairy*

*without disclosing its connection with The French Bros.-Bauer Company, preclude plaintiff from equitable relief?*

The evidence is to the effect that the plaintiff bought the stock of The Townsend-Milk Company and thereby acquired the right to the business, good will and name of said company. Upon a dissolution of the corporation, the plaintiff continued to operate the Townsend-Dairy Company under that name until its merger with the West Dairy.

Upon the purchase of the West Dairy, the plaintiff acquired the right to the business, the good will and name of that dairy and thereafter combined the two dairies and operated the business under the trade name of the "Townsend-West Dairy." The advertisements, letterheads, checks and other printed matter displayed the name of the Townsend-West Dairy and nowhere indicated that the dairy was owned by the plaintiff. There is some evidence to the effect that when customers inquired of Townsend-West drivers whether that dairy was connected with the plaintiff, the drivers answered that it was not, or evaded the question. When Elmer Townsend as manager of the Townsend-West was asked by his employees whether there was any connection with the plaintiff, he replied that Townsend-West was "operated independently." There is no evidence that any other official of the plaintiff company made or authorized any statement to be made denying the ownership of the plaintiff of the Townsend-West Dairy, or misrepresenting such ownership. It is claimed, however, that this method of doing business was in itself a misrepresentation to the public who were thereby misled to believe that Townsend-West was a distinct and separate enterprise which had no connection with The French Bros.-Bauer Company. It is urged that this method of doing business precludes the plaintiff from protecting its rights to the use of the name "Townsend-West" in a court of equity because of the familiar maxim that "he who seeks equity must come into court with clean hands."

The court can not accept the evidence to the effect that the public did not know of the ownership of the Townsend-West Dairy by the plaintiff at par. Each of the witnesses who testi-

fied upon this subject admitted that he knew as a matter of general information that the plaintiff owned Townsend-West. The ownership by the plaintiff of the Townsend-West Dairy appears to have been a matter of more or less general knowledge.

However, assuming that a large number of customers did not know that Townsend-West was owned by the plaintiff, there was nothing illegal in the operation of the Townsend-West business under that name.

A corporation may conduct the business of its subsidiaries under the names by which such subsidiaries are known to the public. In most instances a valuable good will attaches to such names and it would be an unreasonable rule of law which would require a corporation to abandon the good will inherent in the name for which it has paid a valuable consideration.

\*     \*     \*

For this reason the court finds against the defendants upon their defense, and that there is nothing in the conduct of The French Bros.-Bauer Company which prevents them from asserting their rights as owners of the Townsend-West Dairy in a court of equity.

SECOND.—*Has the plaintiff a right to prevent the defendants from using the name "Townsend"?*

No question has been before the courts more frequently than that which involves the use of family names by competing businesses. The general rule to be deduced from the numerous cases upon this subject is that any person has an inherent right to the use of his own name in the conduct of his own business provided that he uses it honestly and fairly and differentiates it from others having similar names. The name with which a person is born is, in a sense, his birthright and may be used by him throughout his life to describe himself, his family and his business so long as his own acts do not estop him from so doing, and do not mislead, deceive or confuse the public. A corporation has no such birthright; its name is chosen by the incorporators. If a family name is chosen it does not necessarily follow that any member of the family is connected with

the corporation, or if a stockholder at the beginning will remain such throughout the life of the company. It has therefore been seriously questioned whether the same rule which permits individuals or a partnership to use their own name in conducting their own business, should apply to corporations which choose family names for this purpose, and that. right has been denied in the well considered case of *Higgins* v. *Higgins*, 144 N. Y. 462.

However, in our opinion the majority rule permits members of a family to use the family name when conducting their business under the corporate form to the same extent as they could use such name if their business were conducted as individuals or as a partnership. We are aware that this rule has been sharply criticised, and that *Nims on Unfair Competition*, takes the advanced position that:

"No man may use even his own name in such manner as to injure another unfairly or fraudulently in his business." (Section 67.)

Since such valuable rights as to the right to liberty, the pursuit of happiness, to life itself, to the custody of one's own children may all be lost by misconduct. Nims urges that the right to the use of one's own name is no more sacred. With some of these arguments we agree, but as a trial court do not feel at liberty to depart from what we consider the established law.

The Townsend Dairy was originally owned by John Townsend. After it was acquired by the plaintiff, his three sons were employed by that company. They were not bound by any covenant not to engage in business for themselves. nor was there any specific covenant against the use of their name in the dairy business. These three sons have now left the plaintiff company and formed a corporation call "The Townsend Bros. Milk Company." Their right to do this is questioned because The Townsend-West Company has, by long years of expensive advertising, built up a specific good will and reputation for the name of Townsend. While it is true that a family name of this character can not become a valid trade mark, it may acquire a secondary significance as descriptive of quality which is entitled to protection in a court of equity as a trade

name. This is the holding of our Supreme Court in the case of *Drake Medicine Co.* v. *Glessner,* 68 O. S. 337, in which the name "Dr. Drake's German Croup Remedy" was protected from competition by an article manufactured by another Dr. Drake and called "Dr. Drake's Famous German Croup Remedy."

The same principle was applied by Judge Stanley Matthews in the Big Store case, 22 N. P. (N.S.), 469, in protecting The Big Store from competition by the Covington Big Store. To the same effect is the French Ice Cream case, 8 N. P. (N.S.), 549, affirmed 12 C. C. (N.S.), 134, 84 O. S. 483, in which ice cream manufactured by French was protected from competition by a corporation named "The French Ice Cream Company" which manufactured so-called French Ice Cream. Another striking example of the extent to which equity will go in preventing unfair competition is to be found in the Black & White Taxi Cab case, 20 N. P. (N.S.), 469, in which the court protected a company which painted its taxi cabs black and white from competition by a rival concern which painted its taxi cabs in the same colors and designs.

We are convinced that the name "Townsend" as advertised and used by the plaintiff has acquired this secondary meaning locally in connection with dairy products, just as "Borden's" has acquired such significance nationally, and that it is entitled to protection against unfair competition by a similar use of said name, upon the same principle as that applied to protect the words "Drake," "Big Store," "French," etc., in the cases above cited. It is particularly equitable that this protection should be extended as against the defendant Elmer Townsend because as the head of the Townsend-West Dairy, vested with authority to spend its money to advertise and build up a good will for the name of Townsend, he now seeks to appropriate the name for his own benefit. *     *     *

We therefore hold that so long as the Townsends personally remain the majority interest in ownership of the Townsend-Bros. Milk Company, they have a right to use the name "Townsend." This right to use does not confer a right to confuse. In view of the evidence as to the probability of confusion, we

hold that the defendants must differentiate their business from that of the plaintiff by using the word "Brothers" in full without appreciation, and by having after the names when ever used a sufficient explanation to show that the Townsend Bros. Milk Company is not connected directly or indirectly with the Townsend-West Company.      *      *      *

We also hold that the word "phone" or "telephone" should be placed before the word "West" wherever this word is used, and that the general appearance and coloring of the wagons, trucks, milk bottle caps, cartons and other devices, (except uniform devices such as milk bottles, etc.) used by the defendants, should be distinctly dissimilar from those previously used by the plaintiff, so as to avoid any possibility of confusion by reason of such similarity, and in view of the advertising by the plaintiff of certain products as "Townsend's Buttermilk" or "Townsend's Butter," the defendants should not be permitted to adopt any similar trade name in connection with the product sold by them.

The court appreciates what is said by Nims in discussing what he terms "The inadequacy of the explanatory phrase rule" Article 71, and in the event practice proves that the order herein indicated is in fact inadequate to prevent confusion, plaintiff may apply for such further order as is necessary to stop all unfair competition or confusion by reason of the defendants' use of the name "Townsend." Nor is it the intent of the court that the explanatory phrases required hereunder must be used perpetually by the defendants, and counsel will be heard when the form of entry is prepared as to the length of time which should be covered by the injunction upon this point.

In our opinion the rule adopted as to the use of the name accords with the decisions of co-ordinate courts in this jurisdiction, and what we regard as the leading decisions upon the subject in the Supreme Court of the United States. *Gidding & Co.* v. *B. A. Gidding & Co.,* No. 192366, Common Pleas Court of Hamilton County, Ohio. *Joslin-Schmidt Company* v. *Groves Chemical Company,* case No. 180339, Court of Common Pleas of Hamilton County, Ohio: *Donnell* v. *Herring, Hall & Marvin Safe Co.* 208 U. S. 267,

and 208 U. S. 554; *Howe Scale Co.* v. *Wyckoff, etc.,* 198 U. S. 118; *Waterman* v. *Modern Pen Co.,* 235 U. S., 88; *Knabe Piano cases, Stix, etc., Co.* v. *American Piano Co.,* 211 Fed. Rep. 271 (8 C. C. A.) and *Knabe Bros. Co.* v. *The American Piano Co.,* 229 Fed. Rep. 23 (6 C. C. A.).

The mass of cases applying this rule in various states are collected in 19 Rose's Notes, 1168-1195, and render the further citation of authorities in this opinion unnecessary.

THREE.—*Should the defendants be enjoined from hiring the employees of the plaintiff, to solicit customers?*

The evidence shows that the plaintiff owns at least seventy-two retail milk routes, and five wholesale routes, and delivers dairy products to its retail and wholesale customers upon these routes. These routes constitute the most valuable property of the Townsend-West branch of the plaintiff's business. Elmer Townsend testified that milk routes are bought, and the good will or route value is based on so much per gallon according to the amount of milk distributed on a given route. He estimated the distribution of milk over the Townsend-West routes of the plaintiff to be 7500 gallons daily, and that the good will of these routes was worth from $10.00 to $12.00 per gallon. The evidence shows that these routes have been built up during the course of many years by the plaintiff company, and the names of its customers are kept in confidential route books which, except when given to the drivers for their use in the delivery of milk, are kept in the office of the plaintiff. Ther were some 84 customers' ledgers, or route books, with th names, addresses and amount of milk required of about 260 customers written in each book. Altogether these lists containe confidential information concerning some 20,000 customers of the Townsend-West Company. The evidence is that these routes were not established by the individual drivers, but that when a driver was employed by the plaintiff he was given the route book and the information that it contained, and in addition was taken over the route by a foreman who taught him how to serve that route. In addition to the driver and the route foreman, there were so-called "skippers" who took a different route each day for six days in order to give the regular

driver a rest of one day out of seven. All of the routes were supervised by a chief route foreman. Elmer Townsend had entire charge of the hiring and firing of all of these employees. His brother, Roy D. Townsend, had entire charge of the office work including the supervision over the route books and customers' accounts. During the last six months of Elmer Townsend's service with the plaintiff, he was asked to qualify himself to succeed Frank French as president of the plaintiff company, and he led the plaintiff to believe that he was willing to do so. During a part of this period Roy Townsend was left in charge of the Townsend-West branch. In addition, Elmer Townsend was a director of the plaintiff company and enjoyed their complete confidence as one of the two most valued heads of its business. As previously stated, Roy Townsend left the employ of the plaintiff early in June, and Elmer left on July 1st, 1925. Their leaving was practically without notice to the plaintiff, and in-so-far as Elmer Townsend was concerned, was in face of the fact that in May he had specifically denied a rumor that was in circulation to the effect that he intended to leave and go into business for himself. Neither Roy nor Elmer were asked to resign, both were in line for promotion and the fact that they intended to leave was completely hidden from the plaintiff company. When Elmer left on July 1st, he took with him, as if by pre-arrangement, Goldkiller, the chief route foreman of the plaintiff, Shank, a route foreman; Murray, a route skipper, Miller, a wholesale route driver; Preston, a skipper; and Hesse, a driver, and within a week twelve other employees, including foremen and drivers, left the plaintiff with the intention of going to work for the defendants. There is evidence that other employees of the plaintiff have been solicited by Elmer Townsend to work for him. It is the apparent intention of the defendants to utilize the former employees of the plaintiff company, and such additional employees of the plaintiff as they may induce to work for them, to solicit the customers of the plaintiff over the routes formerly served by such employees when employed by the plaintiff. In this manner it is claimed that a large part of the business and property of the plaintiff will be taken bodily from the plaintiff by the defendants, and that this will be accomplished solely by reason

of the confidence reposed in, and information obtained by them while in the service of the plaintiff.

On the one hand the defendants claim that they have a legal right, in the absence of contract, to leave the plaintiff company and to establish a separate and competing business and to hire the employees of the plaintiff to work for them and to solicit their former customers; on the other hand, while the right of the defendants to leave the employ of the plaintiff and to establish a competing business is not questioned, the plaintiff claims that the names of its customers and its trade routes and the other information acquired by the defendants, are in the nature of confidential trade secrets which the defendants ought not be permitted by a court of equity to utilize in order to destroy their former employer's business. Two distinct lines of authorities are relied upon by the contending parties. Of these cases the case of *Fulton Grand Laundry Co.* v. *Johnson,* 140 Md. 359, 23 A. L. R. 420, is typical of the cases holding that employees will *not* be enjoined from soliciting customers along the routes formerly served by them. On the other hand, the *Empire Steam Laundry* v. *Lozier,* 165 Cal. 95, *and Peoples' Coat, Apron & Towel Co.* v. *Light,* 171 App. Div. 671, affirmed 224 N. Y. 727, are typical of the cases holding that former employees *will* be enjoined at the instance of their former employer, from soliciting lists of former customers. The cases pro and con upon this debated question are collected in annotations entitled "Right, In Absence of Express Contract, To Enjoin Former Employees from Soliciting Complainant's Customers," in 23 A. L. R. 423 and 34 A. L. R. 399 (1925). A careful reading of these cases discloses that they practically all involve the effort of an employer to enjoin an individual driver from soliciting customers over his old route either for himself or for a competing concern. If this were an effort of the plaintiff to enjoin a single driver from soliciting customers on his former route, either for himself or for a competing concern which had had no previous connection with the plaintiff company, it would fall within the rule permitting such competition. However, the case at bar is quite different. The present case is not an effort to enjoin the drivers as individuals, nor

is it an effort to enjoin the defendants as a competing concern from employing such drivers. In the present case the plaintiff seeks to enjoin a former executive director and high employee from carrying out a plan to compete with the corporation of which he was a director and confidential executive, by depriving it of its customers and key employees, which plan was formed and partially executed while one or more of the defendants were still occupying positions of trust and confidence under the employment of the plaintiff.

These are special circumstances peculiar to the present case which do not exist in the cases wherein an injunction was denied. Under these circumstances we turn from the conflicting cases with refreshing relief to the sound and vigorous statement of the law laid down by those great judges of the Superior Court, whose rare learning, clear thinking and passion for justice, lifted this little court to its high place in Ohio jurisprudence. Of these giant intellects whose names include the present Chief Justice of the United States Supreme Court and his equally distinguished father; the immortal Matthews, and the fiery Foraker, none were blest with greater common sense or a more homely ability to state the eternal principles of justice than the former Attorney General of the United States and the Governor of Ohio, who wrote the decision of the Superior Court in the case of *Smith* v. *Kernan*, 8 Ohio Decisions, Reprint 32 (1880). That case is more nearly like the present case, the defendant was the manager of the business of the plaintiff and while her manager agreed to enter into a rival business and "took all the bakers, drivers and even the hostler and office boy, who went all in a body and started a rival establishment."

Judge Harmon in deciding this case used the following pat language:

"*There is nothing which prevents a man from buying milk from anyone he pleases; yet, as I have said, the courts have enjoined the direct attempt to take bodily the customers established by a long course of dealing from one person to another.*"

More recently the same principle was re-stated by the Superior Court in *Seifried* v. *Maycox,* 1 Hosea 140.

The difficulty with the defendants' position is that what they did was not done *after* they had severed their connection with the plaintiff, but was done, in part at least, while they were still confidential employees in charge of plaintiff's business. While in charge of plaintiff's business the law is that they owed an undivided loyalty to their employer.. Their positions required them to exercise the utmost diligence and good faith in the promotion of the plaintiff's business and any plans to appropriate that business for themselves by taking either the customers or the employees of the plaintiff, or both, constituted a breach of trust and a violation of the good faith required by law. This doctrine is well stated in *Essex Trust Co.*, 214 Mass., 507.

It was the vice of planning a competitive business and to take away the customers of the employer while still in his employ, that was condemned in *Robb* v. *Green*, 2 Q. B. Div. (1895), a leading English case.

The court is satisfied that the employees of the plaintiff did not leave in a body without some understanding with the defendants. We are equally satisfied that this understanding was arrived at while one, or more, of the defendants was still in the employ of the plaintiff, and it was more easily done because of the years of confidence reposed in the defendants by the plaintiff. We do not mean to say that the defendants Elmer and Roy Townsend during these years did not fully justify such confidence; the evidence shows that they did. We merely indicate that it was this relationship which made it easy for the defendants to take from the plaintiff its employees, and if permitted to continue, would unfairly enable the defendants by reason of their former confidential positions to destroy the entire business of the plaintiff.

In our opinion the drivers and other employees of plaintiff and defendants have a right to work for such parties as they please and no injunction will be issued restraining any employee from leaving the plaintiff to work for the defendants or *vice versa*.

We are also of the opinion that the defendants have a right to employ such of the employees of the plaintiff who may desire

to work for them, and no injunction will be issued restraining the defendants from employing, or offering employment to any of the employees of the plaintiff; but it is our judgment that if the defendants are permitted to employ the drivers or former drivers, route foremen, skippers or other employees of Townsend-West branch of the plaintiff, having confidential information as to the trade routes and customers of the Townsend-West Dairy, and are to put these employees to work upon the trade routes served by them while employed by Townsend-West, they would in effect be securing the confidential information, business and property of the plaintiff unfairly, and by virtue of the confidence formerly enjoyed by them as employees of the plaintiff. To put the employees, or former employees, of Townsend-West to work specifically upon the routes served by them as employees of Townsend-West to solicit customers of Townsend-West to come with them to the defendants, would have no other purpose than to appropriate the good will, property and information of the plaintiff in such routes. Therefore the defendants will not be enjoined from employing any of the employees, or former employees, of the Townsend-West branch of the plaintiff company, but the defendants will be enjoined from employing such employees, or former employees, to work over the trade routes served by said employees while employed by Townsend-West, or from employing said employees of Townsend-West to solicit the customers served by them while under the employ of Townsend-West, to become customers of the defendants.

This order will not extend longer than necessary to prevent unfair competition. One year would seem to be a reasonable and proper period, but if counsel on either side desire, they will be heard further upon the time period.

The rule adopted in this opinion will permit free, open competition, but will require that competition to be fair, honest and upon the merits of the product, service and prices rather than upon the inside information or good will of a competitor.

A decree may be drawn in accordance with this opinion.